**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | **CIVIL ACTION** |
| | : | |
| **IN RE INNOCOLL HOLDINGS PUBLIC** | : | |
| **LTD. CO. SEC. LITIG.** | : | |
| | : | **No. 17-341** |
| | : | |

## MEMORANDUM

PRATTER, J.                                                    OCTOBER 28, 2022

Over the course of its five-year lifetime, this class action litigation has absorbed thousands of attorney hours and likely demanded considerable litigation costs, but, finally, a conclusion is in sight. Shareholders sued pharmaceutical company Innocoll Holdings Public Limited Company in 2017, claiming that Innocoll had misrepresented a new product's chances of success in the Food and Drug Administration's approval process. Over four years later, the parties reached a settlement agreement in principle. This Court preliminarily approved the settlement on March 10, 2022, pending a final approval hearing that took place on July 6, 2022. Russel Bleiler and Carl Bayney, the Court-appointed lead plaintiffs in this securities action, have submitted an unopposed motion for final approval of the class action settlement and plan of allocation under Federal Rule of Civil Procedure 23(e), along with an unopposed motion for an award of attorneys' fees, reimbursement of litigation expenses, and compensatory awards to lead plaintiffs. For the reasons set forth below, the Court grants both motions.

### BACKGROUND

Innocoll is a pharmaceutical company that specializes in collagen technologies, making its initial public offering ("IPO") in July 2014. In its amended registration statement for its IPO, Innocoll described the progress of clinical trials for XaraColl, a collagen sponge implant that contains pain medicine and is placed in surgical sites to relieve post-surgery pain. In May 2016,

Innocoll announced the results of Phase 3 clinical trials for XaraColl via press release and said on a conference call with securities analysts that there were no gating factors to filing a new drug application ("NDA") for XaraColl with the FDA. In November 2016, Innocoll announced that it had submitted the NDA for XaraColl. On December 29, 2016, Innocoll issued a press release explaining that the FDA had issued a "Refusal to File" letter for XaraColl. Although Innocoll had tested and submitted XaraColl as a drug, the FDA determined that XaraColl should have been tested and submitted as a drug/device combination. On the day following the press release, Innocoll's share price fell over 61%.

In early 2017, shareholders sued Innocoll and individual defendants, including Chief Executive Officer Anthony Zook and Chief Medical Officer Lesley Russell, for violations of the Securities Exchange Act of 1934, claiming that they had misled investors who relied on the company's positive statements about XaraColl and its chances of FDA approval. The first complaint was dismissed because the plaintiffs failed to meet the Private Securities Litigation Reform Act's ("PLSRA's") heightened pleading standard relating to the element of scienter. After the filing of an amended complaint and a stay of the action while the parties unsuccessfully pursued mediation, the parties proceeded to discovery in April 2020. The extensive discovery included review and categorization of over 400,000 pages of documents and depositions of two experts as well as of lead plaintiffs Mr. Bleiler and Mr. Bayney. While discovery was still underway, the shareholders filed a renewed motion for class certification. Just before oral argument on the motion for certification was to be held on July 6, 2021, the parties announced that they had reached a settlement in principle: Innocoll would pay $2.755 million to the shareholders, and, in exchange, the shareholders would release all claims against Innocoll relating to the alleged misrepresentations (the "Settlement").

Under the Settlement notice program, claims administrator Strategic Claims Services ("SCS") established a webpage, accessible at all times, which provided information relevant to the Settlement, including the current status of the Settlement, case deadlines, the online claim filing link, and the exclusion request form. SCS also maintained a toll-free telephone number through which potential settlement class members could seek further information or request the notice and claim form. SCS mailed or emailed 2,190 nominee account holders or institutional groups (including banks, brokerages, mutual funds, insurance companies, pension funds, and money managers), notifying them of the Settlement and requesting that they send the postcard notice, email the summary notice, or email a link to the online notice and claim form to any customers who might be beneficial purchasers or owners of Innocoll shares. The nominee account holders or institutional groups also had the option of providing SCS with a list of the names and mailing addresses of potential beneficial owners to SCS. Some 3,540 postcard notices were mailed by either SCS or the nominees, of which 105 were returned as undeliverable. A total of 4,465 potential settlement class members were notified of the Settlement via mailed postcard notices or via email containing a direct link to the notice and claim form. The publication notice was also disseminated twice electronically via *GlobalNewswire* and twice in print in *Investor's Business Daily*. The deadlines for settlement class members to submit claims, request exclusion from the Settlement, and object to the Settlement were June 6, 2022, June 15, 2022, and June 22, 2022 respectively. Potential Settlement class members submitted 682 claim forms, of which 123 claims were valid. July 6, 2022 Tr. 3:13–14. No member of the settlement class objected to final approval, attorneys' fees, reimbursement of out-of-pocket expenses, or compensatory awards to the lead plaintiffs.

Under the Settlement's plan of allocation, which was formulated by lead counsel with the assistance of an experienced financial consultant, SCS will calculate class members' recognized

loss based on the time the Innocoll securities were purchased and sold, the purchase and sale price of the securities, and the estimated inflation of the price of the securities at the of purchase and sale. The Settlement amount will then be allocated to approved claimants on a *pro rata* basis, accounting for each class member's recognized loss.

The lead plaintiffs, Mr. Bleiler and Mr. Bayney, filed a motion for an award of attorneys' fees, reimbursement of litigation expenses, and compensatory awards. Lead counsel seek an award of one third of the Settlement, or $918,333. Lead counsel also seek reimbursement of $296,111.74 in litigation expenses, most of which was incurred in retaining an expert who provided evidence in support of the plaintiffs' motion for class certification. Finally, Mr. Bleiler and Mr. Bayney seek compensatory awards of $10,000 each for their dedication to pursuing this claim on behalf of the class.

## LEGAL STANDARDS

Class actions may only be settled with court approval. Fed. R. Civ. P. 23(e). A district court may approve a settlement agreement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Third Circuit Court of Appeals has stated its policy in favor of voluntary settlement agreements, especially in class actions and other complex litigations. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594–95 (3d Cir. 2010). Nevertheless, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).

## DISCUSSION

**I.   Motion for Final Approval of Class Action Settlement and Plan of Allocation**

### A.   Final Settlement Class Certification

The Court conducted an analysis regarding settlement class certification under Rule 23 at the preliminary certification stage. *See In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*, No. 17-

4

cv-341, 2022 WL 717254, at *2–4 (E.D. Pa. Mar. 10, 2022). No material facts have changed since the preliminary certification, and so neither does this Court's Rule 23 analysis. The proposed class—all investors, excluding Innocoll directors and officers, who purchased or acquired Innocoll stock between July 25, 2014 (the date of Innocoll's IPO), and December 29, 2016 (the date it announced it had received the Refusal to File letter)—is ascertainable because "objective" and "administratively feasible" criteria are used to determine membership.

The settlement class also satisfies the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Innocoll, a nationally traded company, had thousands of shareholders during the relevant time period. The plaintiffs in the settlement class share common questions of law or fact, including whether Innocoll's statements around possible FDA approval of XaraColl were misleading, whether Mr. Zook and Dr. Russell knew, or should have known, that the statements were misleading, and whether the statements affected the stock price. Mr. Bleiler and Mr. Bayney, the lead plaintiffs, present claims that are typical of the class because they rely on the same legal theories and alleged misrepresentations as the other shareholders in this suit.

The plaintiffs also fit into one of the subcategories of class actions listed in Rule 23(b). Fed. R. Civ. P. 23(b). Certification is warranted where the class meets the prerequisites of Rule 23(a), "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b), 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The Court found at the preliminary certification stage that the resolution of these disputes via a class action was superior to multiple individual suits, and common issues predominated over individual issues. *See In re Innocoll*, 2022 WL 717254, at *2–4. Where there are potentially thousands of shareholders within the proposed class, class resolution is preferable to multiple re-litigations that would drain both the parties and the courts of their resources. And, as the Court previously noted, common issues predominate because the shareholders must show that Innocoll made a material misrepresentation, that Innocoll knew or should have known was a misrepresentation, that the individual shareholder relied on that statement, and that misrepresentation resulted in a loss of the shareholder's money. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). Because the plaintiffs invoked the fraud-on-the-market theory, this Court found that the shareholders had established a showing of class-wide reliance on Innocoll's misrepresentations. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–47 (1988) (holding that under the fraud-on-the-market theory, applying a rebuttable presumption of class-wide reliance is not improper).

Therefore, the Court finds that final class certification for settlement is appropriate.

**B.  Adequacy of Notice**

Rule 23(e) provides that a court must "direct notice in a reasonable manner to all class members who would be bound by the [Settlement] proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(c) additionally provides that notice, written in "plain, easily understood language," must be sent "to all members who can be identified through reasonable effort" and contain the following information:

> (i)   the nature of the action;
> (ii)  the definition of the class certified;
> (iii) the class claims, issues or defenses;

    (iv) that a class member may enter an appearance through an attorney if the member so desires;

    (v)  that the court will exclude from the class any member who requests exclusion;

    (vi) the time and manner for requesting exclusion; and

    (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Under the PSLRA, notices to settlement class members must also include statements on plaintiff recovery, the potential outcome of the case, attorneys' fees or costs sought, identification of counsel representatives available to answer queries, and reasons for the settlement. 15 U.S.C. § 78u-4(a)(7).

     Here, the notice provided to settlement class members comports with the requirements of Rule 23 and the PSLRA. SCS, a third-party claims administrator acting under the supervision of lead counsel, sent out notices via mail and email that included, *inter alia*, the nature of the class action, the progress and current status of the litigation, the settlement class definition, that a class member may be represented by his or her own lawyer, the process for exclusion, the binding effect of the judgment absent a request for exclusion, attorney's fees and costs sought, the estimated distribution per damaged share, and the time and place of the fairness hearing. The Court finds that the contents of the notices sent to the settlement class members were "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

     Moreover, the notice complied with the proposed notice program. Notices were sent in a combination of individual first-class mail or email to all settlement class members who could be identified. Those mailings were supplemented by copies of the notice and claim forms posted to the SCS Settlement website and a publication notice was published in *Investor's Business Daily* and electronically published on *GlobeNewswire*. The Court concludes that the notice program

provided Settlement class members "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

## C. **Final Settlement Approval**

Courts may approve of class settlements upon finding that a proposal is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Federal Rules of Civil Procedure require that the Court consider "whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate . . .; and (D) the proposal treats class members equitably relative to each other." *Id.* Within the Third Circuit, courts employ a more expansive fairness inquiry, which includes the following nine *Girsh* factors:

(1) the complexity, expense and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and ellipses omitted). Courts may also consider, when appropriate, the six additional *Prudential* factors:

(1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;
(2) the existence and probable outcome of claims by other classes and subclasses;
(3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved— for other claimants;

8

(4) whether class or subclass members are accorded the right to opt out of the settlement;

(5) whether any provisions for attorneys' fees are reasonable; and

(6) whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998). While a district court is required to make findings as to the *Girsh* factors, the *Prudential* factors illustrate additional queries a court *may* pose "for a thoroughgoing analysis of a settlement's terms." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).[1] "The proponents of the settlement bear the burden of proving that [the *Girsh*] factors weigh in favor of approval." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995).

### 1. Initial Presumption of Fairness

District courts in the Third Circuit also apply an initial presumption of fairness for proposed settlements if: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Prudential*, 148 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)). Each prong of this analysis is satisfied here. The negotiations around settlement appear to be at arm's length given the failure of the mediation process that took place in August 2019 and the failures of subsequent negotiations between parties. As discussed in more detail below, the plaintiffs had the opportunity to conduct extensive discovery since this case was filed in early 2017. The lead plaintiff's counsel have demonstrated

---

[1] Despite the 2018 amendment to Federal Rule of Civil Procedure 23(e)(2), which added a list of factors for a court to consider in evaluating class action settlements, courts within the Third Circuit have continued to analyze such actions under the *Girsh* and *Prudential* factors. *Kanefsky v. Honeywell Int'l Inc.*, No. 18-cv-15536, 2022 WL 1320827, at *4 n.3 (D.N.J. May 3, 2022). This Court will therefore focus its analysis on the more expensive *Girsh* and *Prudential* factors rather than the Rule 23 factors.

their experience in prosecuting similar securities class actions for nearly 20 years. Finally, no class members objected to the Settlement. The Court therefore applies an initial presumption of fairness to this Settlement.

### 2. The *Girsh* Factors

The Court now considers each *Girsh* factor in turn and finds that they weigh heavily in favor of approving the Settlement.

#### i.    *The Complexity, Expense and Likely Duration of the Litigation*

"Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate." *In re Par Pharm. Sec. Litig.*, No. 06-cv-3226, 2013 WL 3930091, at *4 (D.N.J. July 29, 2013). The degree of complexity, high cost, and probable significant duration of this matter, should it continue to be litigated, weigh in favor of settlement. Further, there are multiple issues that would either complicate the litigation of this matter or add substantial expense. First, the plaintiff class's claims are complicated where the plaintiffs must establish the requisite mental state of Innocoll, Mr. Zook, and its Dr. Russell, particularly where neither individual defendant sold their own personally-held stock. Second, because Innocoll stock was relatively thinly traded, the plaintiff class could face difficulty establishing that the shares were trading on an efficient market, which would require class members to show their individual reliance on the allegedly misleading statements of Innocoll and its officers. Third, both parties would incur expenses relating to experts, some of whom would describe the underlying issue of the FDA's categorization of drugs, devices, and drug/device combinations and some of whom would model the damages and loss causation based on market and industry conditions at the time of the allegedly false statements made by Innocoll, Mr. Zook, and Dr. Russell. Fourth, the plaintiffs may have difficulty maintaining a class of shareholders who purchased or acquired Innocoll stock between Innocoll's IPO in July 2014

and December 2016, when the first allegedly misleading statement about XaraColl's NDA was made in March of 2016. Fifth, because Innocoll's principal offices are located in Ireland, additional costs would be incurred in the prosecution of letters rogatory in Ireland, the hiring of a qualified Irish barrister to oversee depositions in Ireland, and the costs of preparing for and attending depositions in a foreign country.

Finally, even though the initial complaint in this action was filed in early 2017, if litigation continued, the plaintiff class would still have to succeed in certifying the class, survive summary judgment, survive Innocoll's pre-trial motions, prevail at trial, survive post-trial motions, and prevail on appeal. The lead plaintiffs estimate that, even assuming the plaintiff class's success at each of these steps, class members would be delayed in recovering their damages by at least five years if this action did not settle. While the Court's timing estimate is more optimistic, there is no question that a settlement now will bring recovery and conclusion considerably sooner and with more certainty than full-blown litigation through trial.

### ii.   *The Reaction of the Class to the Settlement*

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *In re Prudential*, 148 F.3d at 318. Here, there were no objections or exclusion requests in response to the notices mailed or emailed to potential class members, nor were there any objections made to the Settlement at the final approval hearing. The significant disparity between the number of class members who received the Settlement notice and the number of objections weighs in favor of Settlement approval. *See In re Cendant*, 264 F.3d at 235.

### iii.   *The Stage of the Proceedings and the Amount of Discovery Completed*

The third *Girsh* factor "captures the degree of case development that class counsel have accomplished prior to settlement," from which courts should determine whether counsel had an

opportunity to assess the merits of the action before negotiations began. *In re Gen. Motors*, 55 F.3d at 813. As noted, this action began over five years ago. In the years since, the plaintiff class has conducted two investigations—involving reviewing public records, speaking with former Innocoll employees, and consulting a regulatory expert—prior to discovery. The plaintiff class also argued twice against Innocoll's motions to dismiss the First Amended Complaint and the Second Amended Complaint. *See generally* Pls.' Resp. in Opp. to Mot. to Dismiss, Doc. No. 29; Pls.' Mem. of Law in Opp. to Mot. to Dismiss, Doc. No. 52. Once the parties proceeded to discovery in April 2020, the plaintiff class reviewed over 400,000 pages of documents, served requests for admissions and interrogatories, prepared for depositions in Ireland near Innocoll's principal offices, deposed two experts on class certification, and deposed both Mr. Bleiler and Mr. Bayney. The parties had ample opportunity to consider the strengths and weaknesses of the action, and the third *Girsh* factor weighs in favor of Settlement approval.

### iv.    *The Risks of Establishing Liability and Damages*

The fourth and fifth *Girsh* factors together "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. As discussed above, should this case continue to be litigated, several complicating factors would need to be addressed. The plaintiff class would need to present expert testimony on the complex technicalities of the FDA categorization of drugs and medical devices as well as the intricacies of market modeling. Additional risk would be incurred on the question of the scienter of the defendants, particularly where Mr. Zook and Dr. Russell did not sell off any of their personally held stock during the period when the price of Innocoll stock was allegedly artificially inflated. Even assuming the plaintiff class could overcome these sizable challenges, it would likely be several

12

years before any of the plaintiff class could receive compensation, particularly if Innocoll appealed a trial outcome favorable to the plaintiff class. Given these risks, this factor, too, weighs in favor of Settlement approval.

### v.   *The Risks of Maintaining the Class Action Through the Trial*

"The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *In re Gen. Motors*, 55 F.3d at 817. As described above, a motion for class certification would face challenges because Innocoll stock was thinly traded, did not receive coverage by many analysts, and had substantial bid-ask spreads, particularly in the time between Innocoll's IPO and December 10, 2015. These are relevant factors that may indicate the absence of an efficient market. *See Hayes v. Gross*, 982 F.2d 104, 107 n.1 (3d Cir. 1992) (noting that factors supporting an inference of an efficient market included: "(1) allegations of a large average trading volume; (2) allegations that a significant number of securities analysts followed and reported on the security; (3) allegations that the security had numerous market makers; (4) allegations that the company was entitled to file an SEC Form S-3 Registration Statement; and (5) allegations of facts showing a causal connection between unexpected corporate events or financial releases and an immediate response in the stock price." (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989)). The degree of risk around maintaining the class action supports approval of the Settlement.

### vi.   *The Ability of the Defendants to Withstand a Greater Judgment*

There is no evidence presented that would suggest Innocoll or its parent could not pay a more substantial judgment amount. But the same can generally be said "in any class action against a larger corporation . . . and . . . this fact alone does not undermine the reasonableness of the instant settlement." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 323 (3d Cir. 2011). Because the parties have not submitted more specific details on this factor, the Court will consider the factor as neutral in its analysis, neither favoring nor disfavoring Settlement.

### vii.   *The Range of Reasonableness of the Settlement Fund*

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential*, 148 F.3d at 322; *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004). The Settlement provides for a fund of $2,755,000, which is about 12% of the plaintiffs' estimated maximum damages of $22,900,000. Horne Decl. ¶ 20, Doc. No. 131. If the certified class were limited to investors who purchased or acquired Innocoll stock between December 10, 2015, and December 29, 2016, the Settlement would represent a 26% recovery of approximately $10,800,000 in damages. The more modest 12% recovery is not unreasonable, given the "costs, risks, and delay of trial and appeal" for both the settlement class and Innocoll, Mr. Zook, and Dr. Russell. Fed. R. Civ. P. 23(e)(2)(C)(i); *see* Laarni T. Bulan & Laura E. Simmons, Cornerstone Research, *Securities Class Action Settlements – 2021 Review and Analysis,* at 6 (2021) (finding that the median settlement between 2012 and 2020 for cases where damages were estimated as less than $25,000,000 was 18.2% of the estimated damages, while in 2021, the median settlement was 12.5%). Because of the considerable risks the plaintiff class would have undertaken if they had

proceeded with more litigation and the guaranteed compensation provided by the Settlement fund, these final two factors also support the Court's approval of the Settlement.

### 3.  Relevant *Prudential* Factors

With the *Girsh* factors weighing in favor of Settlement approval, the Court next turns to the relevant additional *Prudential* factors.[2]

Courts may consider "the maturity of the underlying substantive issues, as measured by . . . the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages." *In re Prudential*, 148 F.3d at 323. As discussed in the *Girsh* analysis, the parties in this five-year-old case have had ample time for investigation and discovery and are well-informed of the strengths and weaknesses of the case should it proceed through litigation. Moreover, plaintiffs' lead counsel has almost two decades' worth of experience in prosecuting securities class actions and has secured significant settlements for clients in cases against large technology, automobile, and biotech companies. The expertise of its counsel bears on the plaintiffs' ability to assess the potential risks and benefits if this case were to proceed to trial.

Settlement class members have the right to opt out of the Settlement, which is yet another consideration supporting the Court's approval of the Settlement.

As further analyzed below, the attorneys' fees requested by lead counsel are reasonable. The fees requested constitute one third of the Settlement fund, which is within a reasonable range given both lead counsel's efforts in a challenging action made more complex by certain adverse

---

[2]    Several of the *Prudential* factors are inapplicable here because no individual lawsuits were filed, nor were claims made by other classes or subclasses. *See In re Prudential*, 148 F.3d at 323 (listing as possible considerations "the existence and probable outcome of claims by other classes and subclasses" and "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants").

facts and a comparison with fee awards in other Third Circuit class action settlements. *See, e.g.,* *Kanefsky*, 2022 WL 1320827, at *11 (approving as reasonable a requested award of 29.2% of the settlement amount and collecting several Third Circuit cases where fees of 33.3% of the settlement funds were approved).

Finally, both Rule 23(e)(2)(c)(ii) and the last *Prudential* factor ask whether the procedure for processing claims is fair. To make a claim, a Settlement class member must submit a "Proof of Claim and Release Form." *See* Stip., Ex. E, Doc. No. 121-7. That form requires that the potential class member provide a list of transactions and documentary proof to confirm class membership and ascertain the loss. This process is reasonable, fair, and typical. *See, e.g., Kanefsky*, 2022 WL 1320827, at *6; *In re Ocean Power Techs., Inc*, No. 3:14-CV-3799, 2016 WL 6778218, at *3, *24 (D.N.J. Nov. 15, 2016).

Having conducted an analysis under both the *Girsh* factors, as required, and the relevant *Prudential* factors, the Court approves the settlement as fair, reasonable, and adequate.[3]

**D.  Plan of Allocation**

Under Rule 23, the Court must consider whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). In the Third Circuit, "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa.

---

[3]     However, the Court's Final Order and Judgment does not incorporate the proposed release with its unbridled breadth of all "Unknown Claims" as proposed in § 1.42 of the Stipulation of Settlement. Stipulation of Settlement ¶ 1.42, Doc. No. 121-2. The Court approves and incorporates a release by plaintiff class members of all claims, known or unknown, arising out of any securities transaction, representation, or value change that occurred or should have occurred, or otherwise existing as of the date of this Order against Innocoll by or on behalf of any and all other members not opting out of the Settlement.

2000) (internal quotations omitted). Plans of allocation that reimburse a member of a class based on the type and extent of his injury are generally reasonable. *Sullivan*, 667 F.3d at 328.

Here, under the plan of allocation, a calculation of each Settlement class member's recognized loss is based on when the securities were purchased and sold, the purchase and sale price of the Innocoll securities, and the estimated artificial inflation of the purchase and sale price at the relevant time, as determined by the plaintiffs' damages expert. The recognized losses are reduced by 90% for claims related to purchases of Innocoll shares during the company's IPO. This adjustment reflects the difficulty of proving that securities purchased in an IPO are purchased in an efficient market, absent unusual circumstances. Recognized losses are similarly reduced by 50% for claims related to purchases in the period between June 25, 2014, and March 16, 2016. This adjustment reflects the relative weakness of claims for purchases of Innocoll stock made before the allegedly misleading statements on the XaraColl NDA, the first of which occurred on March 17, 2016. The Settlement fund is then allocated *pro rata* based on the adjusted recognized loss. The plan of allocation is therefore fair, reasonable, and adequate. *See, e.g.*, *Careccio v. BMW of N. Am. LLC*, No. 08-cv-2619, 2010 WL 1752347, at *6 (D.N.J. Apr. 29, 2010) (finding that plan of allocation with tiered relief did not foreclose a finding that a Settlement is fair).

## II. Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards

Lead counsel seek an award of attorneys' fees equal to one third of the Settlement, or $918,333, as well as reimbursement of $296,111.74 in out-of-pocket litigation expenses. Lead plaintiffs Mr. Bleiler and Mr. Bayney seek compensatory awards of $10,000 each.

### A. **Attorneys' Fees**

The Third Circuit Court of Appeals has approved of "the long line of common fund cases that hold that attorneys whose efforts create, discover, increase, or preserve a [common] fund . . .

are entitled to compensation" out of that fund. *In re Cendant*, 404 F.3d at 205. When a court assesses attorneys' fees, it typically applies one of two methods: the percentage-of-recovery method or the lodestar method. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). However, courts favor the percentage-of-recovery method in common fund cases because this method "rewards counsel for success and penalizes it for failure." *In re Prudential*, 248 F.3d at 333 (quoting *In re Gen. Motors*, 55 F.3d at 821).

District courts in the Third Circuit applying the percentage-of-recovery method must consider ten factors when determining whether a percentage fee award is reasonable. *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009). The so-called *Gunter* factors include:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
> (3) the skill and efficiency of the attorneys involved;
> (4) the complexity and duration of the litigation;
> (5) the risk of nonpayment;
> (6) the amount of time devoted to the case by plaintiffs' counsel; and
> (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). Additionally, district courts weigh "[8] the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations . . . ; [9] the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained . . . ; and [10] any 'innovative' terms of settlement." *In re AT&T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006) (citing *In re Prudential*, 148 F.3d at 338–40, 342). The reasonableness factors "need not be applied in a formulaic way" because "[e]ach case is different, and in certain cases, one factor may outweigh the rest." *Gunter*, 223 F.3d at 195 n.1.

1.   **The *Gunter & Prudential* Factors**

Turning to the analysis set forth under *Gunter* and *Prudential* and applying the factors to this unique case, the Court finds that the attorneys' fees proposed by lead counsel are reasonable.

   i.   ***Size of the Fund and Number of Persons Benefitted***

This case is relatively modest for a securities class action, with a Settlement fund of $2,755,000. At the final approval hearing, lead counsel indicated that there are approximately 123 claimants with valid claims.

Fee awards "involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage [of attorneys' fees] will decrease as the size of the fund increases." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001). Underlying this inverse relationship between the size of the fund and the percentage of awards is the theory that an increase in recovery correlates more to the size of the class than to the effectiveness of counsel. *In re Prudential*, 148 F.3d at 339. Given the relatively small size of the fund here, the Court does not find that an attorney fee recovery of 33.33% of the Settlement fund is unreasonable.

   ii.   ***Objections***

"[T]he absence of substantial objections by class members to the fee requests weigh[s] in favor of approving the fee request." *In re Rite Aid*, 396 F.3d at 305. Here, the notices sent to potential Settlement class members informed them that lead counsel would apply for attorneys' fees of up to one third of the Settlement amount and advised them on how to object to the attorneys' fees. No Settlement class member objected to the attorneys' fees or any out-of-pocket reimbursements sought, and, indeed, no person sought exclusion from the Settlement class. This weighs in favor of approving the attorneys' fees in the amount requested.

### iii.   *Counsel's Skill and Efficiency*

Applying the third *Gunter* factor regarding the performance of counsel, courts consider "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case, and the performance and quality of opposing counsel." *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998). Here, lead counsel have achieved a 12% guaranteed recovery of the maximum possible damages claimed by the plaintiffs. Although the case presented significant factual difficulties for plaintiffs to overcome, lead counsel skillfully opposed two motions to dismiss, underwent significant discovery, prepared for depositions, and fully briefed a motion for class certification that prompted Innocoll to revisit settlement discussions. Lead counsel is experienced in securities class actions, regularly obtaining settlements for clients in excess of $20,000,000. *See* Ex. 2 to Horne Decl., Doc. No. 131-2, at 9–52. The Court finds that lead counsel's skillful performance over the past five years merits approval of the requested attorneys' fees.

### iv.   *Complexity and Duration of Litigation*

As discussed in the *Girsh* factor analysis, "[s]ecurities fraud class actions are notably complex, lengthy, and expensive cases to litigate." *In re Par Pharm.*, 2013 WL 3930091, at *4. Certain adverse facts presented additional complexity for the plaintiffs' case. In the five years since the first complaint was filed, lead counsel has reportedly spent 4,451.28 hours drafting three complaints, opposing two motions to dismiss, undertaking discovery, taking or defending five depositions, briefing motions for class certification, negotiating settlement, and now, filing motions for preliminary and final approval. This lends additional weight in support of granting the fee request.

    **v.**    ***Risk of Nonpayment***

"Courts routinely recognize that the risk created by undertaking an action on a contingency fee basis militates in favor of approval" of attorneys' fees awards. *In re Schering-Plough Corp. Enhance ERISA Litig.*, No. 08-cv-1432, 2012 WL 1964451, at *7 (D.N.J. May 31, 2012). Lead counsel undertook this case entirely on contingency. Given the difficulties presented by the facts of the case, including a question of whether plaintiffs could rely on a fraud-on-the-market theory in certifying the class, there was significant risk that over five years of effort would result in no compensation. This factor, too, militates in favor of granting the requested attorneys' fees.

    **vi.**    ***Amount of Time Devoted to the Case***

Lead counsel aver via affidavit that they have expended 4,451.28 hours on this case. Horne Decl. ¶ 23, Doc. No. 131. This figure accounts for hours billed through June 1, 2022, and presumably does not account for subsequent work relating to final approval of the Settlement and any post-Settlement work. This amount of time appears reasonable to the Court.

    **vii.**    ***Awards in Similar Cases***

The Third Circuit Court of Appeals has previously noted that fee awards tend to range between 19% and 45% of a settlement fund. *In re Gen. Motors*, 55 F.3d at 822. For smaller securities fraud settlements, like this one, that range is typically narrowed to "30% to 35% of the recovery, plus expenses." *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-cv-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005); *see e.g., P. Van Hove BVBA v. Universal Travel Grp., Inc.*, No. 11-cv-2164, 2017 WL 2734714, at *12 (D.N.J. June 26, 2017) (finding a one-third fee appropriate where settlement fund was $4.5 million, before adjudication of the motion to dismiss); *Schuler v. Meds. Co.,* No. 14-cv-1149, 2016 WL 3457218, at *10 (D.N.J. June 24, 2016) (approving a 33% award for attorneys' fee where the common fund held $4.25 million and the case settled at the

motion to dismiss stage); *Yedlowski v. Roka Bioscience, Inc.*, No. 14-cv-8020, 2016 WL 6661336, at \*22 (finding 30% attorneys' fee appropriate where settlement fund amount was \$3.275 million and case settled before adjudication of the motion to dismiss). Lead counsel's request sits comfortably within the typical range of recovery for class action settlements of this size.

    **viii.**    *Value Attributable to Class Counsel*

Lead counsel did not ride on anyone's coattails in this action. No government or third-party action or investigation preceded the filing of the plaintiffs' claims. Therefore, all resulting benefits that accrue to the Settlement class members are attributable to the work of lead counsel, strengthening a conclusion that this Court should approve the requested fee award.

    **ix.**    *Negotiated Percentage Fee*

The ninth factor in the fee reasonableness inquiry requires the Court to consider the percentage fee that would have been negotiated if the case had been subject to a private contingent fee agreement at the time counsel was retained. Courts in the Third Circuit have found that a one-third contingency fee would fit within the customary range. *See, e.g., Dartell v. Tibet Pharm., Inc.*, No. 14-cv-3620, 2017 WL 2815073, at \*8, \*11 (D.N.J. June 29, 2017); *Yedlowski*, 2016 WL 6661336, at \*23. This weighs in favor of granting the requested attorneys' fees of one-third the amount of the Settlement Fund.

    **x.**    *Innovative Terms*

Lead counsel has not suggested that the Settlement has any non-standard terms, so this factor does not support approval of the requested fees. Nevertheless, the clear weight of the *Gunter* and *Prudential* factors suggests that the requested fees are reasonable.

### 2. Lodestar Comparison

The Third Circuit Court of Appeals has encouraged district courts to cross-check a percentage fee award against a lodestar calculation to confirm its reasonableness. *In re Rite Aid*, 396 F.3d at 305–06. "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* at 305. The lodestar multiplier, in turn, is calculated by dividing the requested attorneys' fees by the lodestar award amount. *Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 572 (E.D. Pa. 2012). A fractional multiplier is within the acceptable range in the Third Circuit "and provides strong additional support for approving the attorneys' fee request." *Id.*

The lodestar award calculated by lead counsel through June 1, 2022 is $2,423,348.25. Horne Decl. ¶ 23, Doc. No. 131. Counsel's hourly rates, per this calculation, are relatively high, ranging from $550 to $1,250 per hour. Nevertheless, lead counsel avers that these rates are equivalent to peer firm current rates and take into account the partnership status, education, experience, and reputation of the billing lawyer. Courts in the Third Circuit have found that hourly rates ranging between $295 to $1,250 are reasonable in the context of securities class actions. *See In re Wilmington Trust Sec. Litig.*, No. 10-cv-0990, 2018 WL 6046452, at *10 n.4 (D. Del. Nov. 19, 2018). When compared to the requested attorneys' fee of $918,333, the lodestar multiplier is 0.38. Moreover, counsel's actual hourly rate, calculated by dividing the $918,333 requested by 4,451.28 hours, is a more modest $206.31 per hour. The lodestar cross-check therefore confirms the Court's conclusion that the requested fee award is reasonable.

**B. Litigation Expenses**

In addition to an attorneys' fee award, lead counsel request reimbursement of out-of-pocket litigation expenses of $296,111.74. "In the Third Circuit, it is standard practice to reimburse litigation expenses in addition to granting fee awards." *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 658 (E.D. Pa. 2015). A summary of expenses may be adequate to show that the expenses incurred were reasonable. *Chemi v. Champion Mortg.*, No. 2:05-cv-1238, 2009 WL 1470429, at *13 (D.N.J. May 26, 2009).

Lead counsel has produced a categorized list of expenditures. Horne Decl. ¶ 27, Doc. No. 131. Counsel also provided, at the Court's request, invoices substantiating the significant expense incurred relating to the plaintiffs' financial expert, which constituted $188,207 of the $296,11.74 requested. The expenses included: court fees, copying and printing costs, document hosting and analysis, FDA expert fees, financial expert fees, investigator fees, legal research, mediation fees, overnight and hand delivery, service of process, travel, and costs related to press releases and notice to class members. Courts generally permit reimbursement of expenses within these categories. *See, e.g.*, *Kanefsky*, 2022 WL 1320827, at *12 (approving reimbursement of expenditures for experts, consultants, computer research, and travel); *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, No. 13-cv-6731, 2017 WL 4167440, at *9 (E.D. Pa. Sept. 20, 2017) (finding photocopying and postage expenses, *inter alia*, to be reimbursable); *Katz v. China Century Dragon Media, Inc.*, No. CV11-02769, 2013 WL 11237202, at *8 (C.D. Cal. Oct. 10, 2013) (approving the reimbursement of mediation, private investigation, service of process, press release, and notice fees). Moreover, although the notice provided to potential Settlement class members stated that lead counsel would seek reimbursement of expenses up to $325,000, no

Settlement class members objected to the reimbursement. The Court therefore approves lead counsel's request for reimbursement of $296,111.74 in out-of-pocket litigation expenses.

### C. Compensatory Awards for Lead Plaintiffs

Mr. Bleiler and Mr. Bayney, the lead plaintiffs, seek an award of $10,000. "[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 106 (E.D. Pa. 2013). The PSLRA contemplates "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Unlike the attorneys' fee analysis, a district court need not employ factors to determine the amount of class representative awards. *See Brady v. Air Line Pilots Ass'n*, 627 F. App'x 142, 146 (3d Cir. 2015).

Both Mr. Bleiler and Mr. Bayney have adequately and diligently attended to this litigation since it began over five years ago. They both prepared and sat for depositions, searched for and produced documents, reviewed pleadings, and oversaw the adequacy of lead counsel's representation. Mr. Bleiler and Mr. Bayney devoted 90 hours and 73 hours, respectively, to this case, with Mr. Bleiler communicating with lead counsel over 150 times during the litigation and Mr. Bayney spending two vacation days to prepare for his deposition.[4] The notices sent to potential Settlement class members informed them that the lead plaintiffs could seek compensatory awards up to $10,000 each, and no class members objected to that information. Finally, a compensatory aggregate award of $20,000 is relatively modest at less than one percent of the Settlement fund

---

[4]     Mr. Bleiler disclosed via affidavit that following his approval of the Settlement and attorneys' fee requests, he began an internship with the Schall Law Firm, co-counsel to plaintiffs in this case. Mr. Bleiler received no compensation in connection with this internship, which ran from January to May of 2022, and the Schall Law Firm will not receive any portion of the attorneys' fees in this action. Given this additional information, the Court finds no ethical concerns in awarding Mr. Bleiler a compensatory award for his work as a lead plaintiff.

and is not unreasonable when compared to compensatory awards granted by other courts in the Third Circuit. *See Elkin v. Walter Inv. Mgmt. Corp.*, 17-cv-02025, 2018 WL 8951073, at *2 (E.D. Pa. Dec. 18, 2018) (awarding lead plaintiff $10,000 from settlement fund of $2.95 million); *In re Par Pharm.*, 2013 WL 3930091, at *11 (approving an award of $18,000 from a settlement fund of $8.1 million after finding that the lead plaintiff had reviewed and approved pleadings and regularly communicated with lead counsel, and no objections had been raised by class members in receipt of notice that the award was sought).

The Court therefore grants Mr. Bleiler and Mr. Bayney compensatory awards of $10,000 each.

CONCLUSION

For the reasons set forth above, the Court finally approves the Settlement and plan of allocation and awards attorneys' fees of one-third of the Settlement, reimbursement of litigation expenses of $296,111.74, and compensatory awards of $10,000 to both lead plaintiffs. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE